ALFRED LEMONT *& als. versus* IVORY LORD *& als.*

The master of a ship is *primarily* the agent and representative of its owners; but, in his character of master, he has originally a latent potentiality of other powers which subsequent events may call into exercise.

If his voyage is prosperous and free from disaster, he has no right to intermeddle with the cargo, on the voyage or on its safe termination; but in case of disaster, peril or stress of weather, he may be called upon, in the absence of all other parties, to act from necessity as the agent of each and all persons interested in the vessel, cargo and insurance.

When a vessel is lost by the perils of the sea, or it puts into a port in distress, and is condemned as unseaworthy, the ship owner is not bound by the terms of the charter party which excepts the "perils of the sea," to forward the goods saved; but the ship owner, or the master, as his agent, *may*, and it is his *duty* to tranship them, if thereby anything can be saved as freight to the owner.

If this cannot be secured, the master cannot bind his owners to pay to the owner of the second ship, a rate in excess of the original freight.

The master *may*, and it is his duty to act as agent or supercargo of the owners of the cargo, when he can send the cargo forward at a rate of freight which, under the circumstances, reasonably promised to be for the interest

Lemont *v.* Lord.

of the owner of the cargo. In so doing, he acts as agent of the shippers, and not of the owners of the ship.

Where a ship was condemned at an intermediate port, and the master in his own name as master, in the absence of all others interested, after publicly advertising for tenders to forward the cargo, transhipped it at a rate in excess of the original freight, (that being the lowest tender,) to the original consignees; and, upon arrival at the port of destination, the consignees, refusing to receive the cargo transhipped, the master of the second ship, after due preliminaries, lawfully sold the cargo, the net proceeds of which were less than the amount of freight due; — *Held*, that the owners of the second ship could not recover of the owners of the first, the balance of freight thus stipulated, either on the bill of lading or on an implied assumpsit.

On Facts Agreed.

Assumpsit.

The facts sufficiently appear in the opinion of the Court.

*P. Barnes,* for the plaintiffs, substantially argued as follows : —

I. The carrier, who is unable to obtain his freight, on right delivery of cargo, or offer to deliver, may recover it by suit against the party who contracted for the carriage, the shipper or consignor. *Blanchard* v. *Page,* 8 Gray, 281.

This case, as reported above, is to be distinguished from the same case as cited in 1 Parsons' Maritime Law, 222, note. That citation appears to be from the *first* decision, which was afterwards reversed, by the same Court, on rehearing, as stated in the report by Gray, *ubi supra.*

The point stated by Parsons in the same note, that, in the case supposed, the shipper or consignor can be sued, only when he is the owner of the goods, (which proposition is against the authority of the final decision in *Blanchard* v. *Page,*) is also disposed of by the fact, that, in the case at bar, the owners of the Waban were bailees — special owners — of the cargo, which the Lemont was engaged to carry, and so within the rule stated by Parsons.

II. The question in the present case is, who was the shipper in the Lemont, of the coal carried by that vessel, from the Mauritius to Rangoon? Did the master of the Waban,

in making the contract with Anderson, act as the servant of the owners of the Waban, or only as agent for the owner of the cargo?

This involves the question — when a ship is unable, by reason of sea damage, to complete her voyage, what is the duty of the master, in respect to forwarding the cargo in another vessel?

To inquire, however, what is the duty of the *master?* is the same thing as to inquire, what is the duty and liability of the *owner* of the disabled ship? "No distinction can be made between the two." "The rule will be the same, whether the transhipment be made by the ship owner or the master." Lord DENMAN, in *Shipton* v. *Thornton,* 9 Ad. & El., 314.

By some systems of law, and by some jurists, it has been held, that the master, or his owner, has the *right* to tranship, if he is able and chooses to do so, to earn his own freight. Others hold that it is a *duty,* which must be performed, when it can be, reasonably, and that, if extra expense arises from the hire of the substituted vessel, it is to be borne, eventually, by the owner of the cargo, or his insurer.

The different doctrines are stated, much in the same manner, in Marshall on Ins., 378, note; 3 Kent's Com., Lect. 47; *Shipton* v. *Thornton, ubi supra;* 1 Parsons' Mar. Law, 161, note, resulting in this : —

The ancient systems of law, prior to the larger development of modern civilization and commerce, held only (so far as is known) that the master had the right or power to tranship.

The French law, by the terms of its positive codes, and the authority of its highest jurists, makes it the duty of the master to tranship, if he can.

The English law (it is said) has not decided, whether it is a duty, or only a right.

The American law agrees with the French.

III. Although the French cases are but systems of positive law, the enactments of legislators, yet it is well shown

in the prefaces, both of Emerigon and of Valin, how wisely
and firmly the ordonnance of 1681 was planted upon the
judgments of the Parliaments and Admiralties, the customs
of merchants, and the consultations of learned men; giving
it, in fact, a judicial character, and making it worthy of re-
gard as a basis of universal maritime law.  In like manner,
Chancellor Kent, in Lectures 42 and 48, finds, in both these
codes, foundation and support for the settled American law
of shipping and insurance.  Valin, tom. i., pref. iii., pp. 651–
653 ; Emerigon, tom. i., pref. xv., pp. 423 & *seq.*

The English jurists, however they have delayed to admit,
into the law of shipping, the *duty* of the master to hire an-
other vessel, have not hesitated to hold, in their doctrine of
insurance, all that the French codes require on this head, as
a rule of the general maritime law.

Valin and Pothier are said to have opposed the rule of
the ordonnance respecting the hire of another ship.  Rather,
it may be said, they oppose the interpretation which they
themselves put upon the article in question.  Pothier, tom.
ii., p. 394.

The ancient systems of law, and Pothier and Valin, in
like manner, so far as appears in their criticism upon Article
XI., differing from Emerigon, left the cargo to perish, or
exposed it to a destructive sale, at the place or port of dis-
tress, if the master, in the absence of the freighter, did not
choose to gain his freight by sending it on.

IV. Pressed by such consequences, the modern commer-
cial law has sought to establish rules for the preservation of
the cargo, and the protection of the freighter's interests.  At
some times, and in the terms employed by some authorities,
these rules are stated as though a theoretical doctrine had
been *invented* (the expression is not used offensively) for the
protection of cargo interests.

Lord DENMAN, in the case cited above, assuming a tran-
shipment to be at a higher rate than the original, states, as
the expression of the master's power, " another principle
*will be introduced,* that of agency for the merchant."

Kent says, 3 Com., Lect. 47, "the character of agent of the owner of the cargo is *cast* upon him [the master] from the necessity of the case."

Lord STOWELL, in the *Gratitude*, 3 C. Robinson's Adm., 240, says, "the authority of agent is necessarily *devolved* upon him;" and, in another place, "the character of agent and supercargo is *forced* upon him;" and again, "the character of agent, respecting the cargo, is *thrown* upon the master."

These expressions may seem to imply that something *new* is brought forward at the place of distress, invented or imported, to relieve a difficulty, and to guard against sacrifice of the interests of the cargo owner.

If such terms are to be interpreted as meaning that, in any case, even that of transhipment at a higher rate, the master can act, only and exclusively, for the owner of the cargo, and that his character as servant of the ship owner is divested and extinct, then the defence in the case at bar, is made out. But it is to be seen whether they are not to be interpreted consistently with the principle that the duty to preserve and forward the cargo rests upon the ship owner, to be performed by himself, or by his servant, the master, as an implied, but actual, part of his original duty as a carrier.

Certainly, Lord DENMAN declares, that whatever duty rests upon the master, rests also upon the owner of the original ship, even though the new freight is in excess of the first.

And Sergeant SHEE, in his additions to Abbott, after stating that it is *either* the *duty* or the *right* of the *ship owner* to tranship, adds, (p. 369.) "If it be the former, it must be so *in virtue of his original contract.*"

And this is said in immediate connection with the quotation from Lord DENMAN last referred to.

V. But the late case of *Thwing* v. *Washington Insurance Company*, 10 Gray, 443, an *insurance* case decided in 1858, not published till 1864, contains some very strong state-

ments to the effect that, where the transhipment can be made only at a rate in excess of the original freight, the master cannot bind his owner by a contract for such transhipment.

It was the case of a guano ship, which, immediately upon leaving the Chinchas, became disabled by sea peril. The cargo was forwarded to its destination by another vessel, at the same rate of freight. The owner of the original ship sued the insurer of his freight, for a total loss.

The actual decision of the only issue in the cause was, in effect, that freight, which is lost in the very act of earning it, may be recovered from the insurer.

The counsel for the defence contended that here was no total loss of freight, but that the cargo was, in fact, carried safely, and freight was earned. In response to such argument, the opinion, by BIGELOW, J., contains such expressions as these : —

"We think it may safely be said, that whenever, and as soon as, the owner of a vessel, by reason of the perils of the sea, *ceases to have any interest*, either in the ship or freight, so that nothing of either can be saved or protected, by any act of the master, *his authority to bind the owner is at an end*. The subject matter of the master's agency for the owner of the ship has, in such case, *ceased to exist*, and his *power to bind his principal ceases* with it." p. 460.

It is questionable, whether these propositions, found, as they are, in a mere insurance cause, have any higher authority than that of *dicta*, upon an issue arising under the general law of shipping. The master may not have had such power as to bar his owner from recovering insurance on freight, and yet, upon the same facts, he may have been empowered to bind him to the owner of the second ship.

VI. But the expressions quoted from the opinion of BIGELOW, J., if pressed, in the case at bar, appear to be open to these objections.

First. They are unique and unprecedented. So far as investigations have been made, on the plaintiffs' side, no text-

writer, code, or Judge has ever before declared, that in any predicament, while cargo subsists in charge of the master, does the master "*cease*" to be the servant of the ship owner, in respect to such cargo. The absolute and peremptory divesting the master of his agency for his owner, and vesting him with a separate, independent and exclusive agency for the owner of cargo, is a novelty in the law of shipping. "Double agency," "agency for both parties," "agent for all concerned,"—these and such expressions are found in all the books; so also the idea of an *added* agency, or enlarged power, "*cast*," "*thrown*," "*devolved*" upon the master, is familiar enough, as the quotations from Lord STOWELL, Lord DENMAN, Chancellor KENT show. But these expressions by no means include the idea, that all agency for the ship owner in respect to the cargo is *cast off*, *terminated* and *extinct*. And, as Lord DENMAN declares and deliberately repeats, that, in the extreme predicament of the case at bar, the same duty, whatever it is, rests both upon master and owner, and, as the owner usually cannot act, and is never expected to act, otherwise than through the master, Lord DENMAN's authority appears to be in direct opposition to the *dicta* now under comment.

Second. That a rule of conduct made up from such expressions, would be a rule, measuring the duty of the original ship owner, by a simple balancing of his own profit in the case, and so not unfrequently placing him, and his servant, the master, under a most inexpedient bias against the interest of the freighter.

If it is desirable for the first ship owner to be freed from further responsibility for the cargo, and so placed that no person can "*bind*" him to any further duty about it, would there be much difficulty, at a remote port, in so shaping arrangements for the new freight, by himself, or by the master, usually in sympathy with him, often a co-partowner, as to divest himself of all care or concern for its preservation?

Third. Such a rule would be essentially an arbitrary one. Strictly and narrowly stated—and yet not too strict-

ly, according to these *dicta*, it would be a rule of mere comparison with a precise sum. In *Thwing* v. *Washington Ins. Co.*, the new freight was exactly the same as the first. In the case at bar, it was one-eighth greater. In other cases, a dollar more, or a shilling more, or less, would turn the balance between responsibility and immunity.

But the general law, and the jurisprudence of tribunals never originate arbitrary rules. Statutes do this; usage and the custom of merchants may do it, and, when customs are adopted by the courts, they become a part of the law. But all the benches of Judges in all the commercial world cannot make an arbitrary rule.

Fourth. Since the rule, if any, must be, that, in case the new freight is less than the first, the master *can* "bind" his owner by contract to send it forward, and must do so—other things being equal—then the rule is self-abrogated, so far as it depends upon the question of "interest" or advantage to the ship owner. For, in many cases, readily supposable, it may be greatly for *his* mere advantage to "cease" to have any further liability for the cargo, even though it could be sent on, for something less than the original freight. As between him, and his underwriter on freight, he owes the latter a duty to save what he can; and there are methods in the law, by which the underwriter, if proper steps are taken, may have the benefit of even a small saving. But freight is not always insured, and the master is not presumed to know, and often does not know, whether it is or not; so that the rule of his action, at the place of distress, is not to be framed merely upon that element of the case. And what a rule it would be, to be engrafted upon the general maritime law, that a ship owner is bound to save, for the insurer of freight, a hundred dollars, or any little sum, which can be gained in the transhipment, but may leave a whole cargo to perish, so far as he is concerned, rather than incur a primary and contingent liability — to be compensated for, eventually, by transhipping for that much

more than the first freight? Does not the supposed rule forget the cargo owner, and the insurers of cargo?

VII. Recurring to the question of the present case :— Is it the duty of the ship owner, by himself or his servant, the master, to make engagements for sending on the cargo, when it can be done *reasonably?* And is this duty a part of his original contract of carriage?

If so, then, when he hires the substituted ship, it is that he may fulfil this part of *his own* duty, and, by saving the cargo for its owner, may discharge his own liability for its conservation. And when, to effect this, he enters into contract, by himself or his servant, with parties whom he finds at the place or port of distress, to assist him in performing his own duty, he secures a benefit to himself, on which he is liable, primarily, as on any other contract, made upon like consideration. The parties, who so assist him, may look to him for their hire.

These parties are not merely the master and owners of the substituted vessel, but all concerned in the acts of preservation, — wreckers, lightermen, porters, teamsters, warehousemen and the like.

VIII. This duty of the master, to forward cargo by another vessel, is broadly enough stated by English Common Law Courts of the highest authority, and by their approved text writers, — and that without any such limitation of *gain* to the owner of the disabled vessel.

It would seem that the English law has hitherto adopted the principle, only as a rule of *insurance,* and cases have not yet arisen, requiring Courts to assert it as a part of the general law of shipping. Hence, in cases under the latter head, involving allusions to the principle, but not requiring its absolute assertion, they hesitate, (or *some* of them do,) while in insurance cases and discussions, their statements are as unqualified as the French code; nor has any case or *dictum* been found, in which the English courts or jurists hold that, under any circumstances, this duty of the master

is one which he performs *merely* as agent for the owner of the *cargo*.

Thus, *Marshall* on *Insurance*, (1802,) p. 378, under the title, "Of Changing the Ship," says:—

"If, in the course of the voyage, the ship be disabled, the captain *ought* to hire another vessel for the transport of his goods, and proceed on the voyage, if, under all the circumstances of his situation, it be for the interest *of all concerned* that he should do so."

He cites *Plantamour* v. *Staples*, Douglas, 219, an insurance case, decided by Lord MANSFIELD and his associates in 1783, where, on a round voyage, two ships had been lost, and two others employed. No question arose about rates of freight, and, in fact, much of the case went upon admissions; but, as to what was controverted, Lord MANSFIELD said — "That being done, which was the best that could be done, the underwriters are liable."

And, in the same case, BULLER, J., said, more explicitly, "In *Mills* v. *Fletcher*, it was decided that *the captain has a general power*, and is *bound in duty* to do the best *for all concerned;* and what was done in this case, was manifestly for their interest."

In *Mills* v. *Fletcher*, 1 Douglas, 230, also an insurance case, (decided in 1779,) Lord MANSFIELD "told the jury that, if they were satisfied the captain had done what was best *for the benefit of all concerned*, they must find as for a total loss."

And afterwards, *in banc*, his Lordship said, "the captain had an implied *authority for both sides*, to do what was right and fit to be done, as none of them had agents in the place."

————"I left it for the jury to determine whether what the captain had done was *for the benefit of all concerned*."

And, in *Cook* v. *Jennings*, 7 D. & E., 381, (1797,) which was on a charter party, LAWRENCE, J., did not hesitate to say—"When a ship is driven on shore, it is the *duty* of the master either to repair his ship, or procure another, and,

having performed his voyage, he is then entitled to his freight."

Plainly, it is the conservation of the cargo which is the foundation of those rules of the modern commercial law, which declare the duty of the ship owner or ship master to forward by another ship, or do any other reasonable acts which the safety of the cargo requires. And hence, when, in the development of modern commerce, there had sprung up the interest of underwriters, it becomes plain why the modern maritime law, amongst other things to be done for the preservation of the cargo, demands, as a *duty*, that when the first ship is disabled the goods shall be sent forward in another ship, if it can be done reasonably; and that too, without stopping to measure this duty merely by the minor incident of a small gain to the first ship owner, or loss to the cargo owner, in the hire to be paid for the new service.

Hence it is that the French code of 1681, so decisively provides for the safety of the cargo by transhipment, while the Rhodian law, with other early systems, left it to perish.

Had the English law of insurance been reduced to scientific system, as early as the French, there can be little doubt that the doctrine, now found so abundantly in the English insurance cases, would long since have been admitted into their general jurisprudence, as a part of the law of shipping. In fact, the French code was a law of insurance as well as of shipping; while it was more than a hundred years later, before the principles of the English law of insurance were "judiciously collected." Kent's Com., Lect. 48.

IX. Chancellor KENT, stating the American law, says, (Lect. 47,) "In this country, we have followed the doctrine of Emerigon, and the spirit of the English cases."

"The spirit of the English cases" plainly means, that although the jurisprudence of England has delayed to declare, as a part of the general law of shipping, that transhipment is a duty in any case, yet the English *insurance cases*, from Lord MANSFIELD down, if not before, fully hold that the

master must do the best he can, when his ship is disabled, for the benefit of *all concerned.*

His reference to Emerigon brings us to the highest scientific authority, and, probably, shows the original of all the expressions about the master's " agency for the owner of the cargo."

Emerigon's comprehension of the whole maritime law, in the spirit of the ordonnance, enabled him to use accurately, whether discussing questions of insurance or of shipping, the principles common to both.    Hence, in his chapter on change of ship, he takes issue with Valin and Pothier, who had discussed Article XI., not as a subject of insurance, but of freight, and declares in terms, which it is impossible to misunderstand, —

"But, if the accident has happened in a far country, so that the freighters cannot give their order, neither by themselves, nor by their correspondent, it is not doubtful that the captain, who is *not less* the agent of the freighters, than of the ship owners, ought to watch for the preservation of the merchandize, and do all that which the circumstances demand for the best."

" *His quality of captain makes him master*, and confers upon him the care of all that which concerns the ship and the cargo."

"He is then obliged to do that which it is to be presumed that the freighters would, if they were present."

"He would be, by consequence, very blamable, if, causing a part of the goods saved to be sold, for his freight so far, he should leave the rest in the far country, while he might have been able to forward the whole, by another ship, to the place of destination."

These expressions of Emerigon certainly do not imply that the master's authority is a novelty, specially originating at the moment of distress.    " *Not less* the agent of freighters than of ship owners," imports an intrinsic permanent charge of the interests of both.    And, it is not the accident, not the excess of new freight, that require him to

act for the cargo owner, but his "*quality of captain*," his official character, as servant to the ship owner. It is *that* which "confers upon him the care," &c.

Nor is there any color to the idea that, in any contingency, does the master "cease" to be the servant of the ship owner. Emerigon enters into no balancing of a gain to be made, or a loss to be suffered by transhipment, at a lower or a higher rate.

And yet he does not fail to observe and provide for the case that the new service may involve an increase of freight, and gives the ultimate solution of that case, by casting the additional charge upon the insurers of the cargo. These are his words :—

"And it is much better that, in such a case, the captain should be, on the one part, obliged to hire another ship, and that, on the other, the increase of freight should be for the account of the merchandize and the insurers."

Is there not, therefore, a common principle, with which the various expressions used by Emerigon, Mansfield, Buller, Stowell, Kent and Denman, are all plainly consistent?

Concede, if technically desirable, that the master's power and duty, with respect to cargo, and as to all but its simple carriage, are merely dormant while his ship is sound, and that they come into active exercise only when the disabling of his vessel requires something new to be done, for the safety of the goods, ———— do not all these jurists agree that then the master is bound to do whatever the exigency *reasonably* requires? And as to the expressions that an agency for the owner of the cargo is then "forced," "cast," "thrown," "devolved" upon him, (expressions not found in Emerigon,) do they mean anything more than that the exigency "forces" him to use the powers, which are inherent in his "quality as captain?"—that, at the time and place of distress, the master's powers are enlarged, but his *quality* is not altered?

X. "The best for all concerned." There are always two original parties concerned in what is done at a port of dis-

tress, the ship owner and the freighter. There may also be insurers of ship, of cargo, and of freight.

The master's agency for the ship owner is original, direct and express, by actual contract of service. The duty, which he owes to the others, or any of them, although it may be cotemporaneous, is indirect, implied, contingent, and often entirely uncertain, in the sense that he does not know, and cannot inform others, who is the owner of the cargo, nor whether there are insurers or not.

Amongst these parties, so concerned in the original shipment, he is agent for them all. But the new parties, strangers, whose assistance he implores in distress, know him only as the master of the ship, and servant of the ship owners. They have no means of knowing him in any other quality.

The ship owner is always known. The owner of cargo is not known except by hearsay; consignor and consignee are named in the bill of lading, but both may be nominal and formal.

The master's judgment, at the port of distress, may often be erroneous, as to what the interest of one or another of the original parties requires. He may suppose that he is securing a benefit for one, or leaving a burden to be borne by another, but his judgment and his acts are subject to revision by those parties, or by the courts of law, deciding upon the issues they raise.

But the new parties, with whom he contracts for relief, are not to be involved in these outside implications and questions of relative interests. If they were to be hung up in suspense, until it should be settled in whose precise interest the master was acting in any particular engagement for relief, they would refuse to act, or demand their hire beforehand and, in either case, usually, the goods would perish.

In the case at bar, it does not appear that Anderson had any knowledge of the original rate of freight. He and his owners are wholly unaffected by any question of saving or loss to the owners of the Waban.

The new contract was made by tender. When Hartridge put out proposals, when the tender came to his hands, down to the last moment, he was servant of the ship owner, and so necessarily regarded by Anderson. When he *accepted* the tender, did his agency shift — *instanter* — Anderson ignorant both of the fact, and of the reason for it?

XI. The theory that the master is agent for all parties is not a rule which affects his relation to those giving assistance at the place of distress, nor one that makes his agency oscillate and shift between one original party and another, — not a rule, which, in any form of exigency, terminates and excludes, then and there, all right to act as the servant of his owner, and gives him, on the spot, a new, separate and independent service for freighter or insurer, — not a rule, which, by its uncertain aspect toward those invited to repair the accident, or furnish relief, would, in effect, repel them, and prevent relief; but a rule, which, recognizing the necessary enlargement of the master's power, when his ship is disabled, provides for the ultimate adjustment of the whole transaction between the original parties, when all is done and closed, and for distributing to each one of them, their several shares of benefit, expense and loss, according to their several interests, and according to the principles and tenor of their several contracts, whether of carriage or insurance.

Such must, undoubtedly, be the use of the rule intended by *Philips*, (2 Phil. Ins., § 1634,) quoted by BIGELOW, J., where, speaking of the motives of the master as being wholly on the side of one party, "he must be presumed *to have acted* in behalf of such party."

As a rule of insurance law, to be applied between original parties, after the acts done and finished, as unobjectionable as it is familiar, but not controlling the immediate parties to a contract for assistance to a disabled ship, charges incurred at a place of distress for the preservation of the cargo, must be paid to those who render the service, by those who primarily engage the service; but, in consonance with the

contract of insurance, they may, eventually, fall upon the insurer of the cargo or of freight, upon whose *ultimate* behalf the master shall be held "*to have acted.*"

XII. In fact, if the master's agency were to be limited, with respect to third parties, with whom he contracts for transhipment or other service, merely by interests and consequent motives, as between original parties, and if his duty were to be a shifting one, as these interests might "cease" or change, then, it would not be enough to say, in a case like the present, that the second carrier must look to the owner of the goods for his hire. *Non constat*, in any case, but that the freighter may have abandoned to insurers, and that his abandonment may have been accepted. Acceptance of abandonment passes all title, and "terminates" the interest of the freighter. It relates back to the date of the loss; the insurer takes *cum onere*, and is bound, eventually, to pay the bills. Is the second carrier to be repelled, first, in his suit against the ship owner, who employed him, because the interest of the latter had "ceased," and then to be cast a second time, in his suit against the freighter, because the latter had abandoned, and all *his* interest had "ceased" and gone over to the insurer? Rather, is not the second carrier to be paid by the party who employed him,—and the latter then to have his recourse over, in final adjustment, directly or indirectly, against the freighter or insurer, as their interests and liabilities may prove *to have been?*

In the case at bar, the plaintiffs are ignorant, and the case does not find, whether there was insurance on cargo or not. The extraordinary course pursued by the consignees may well raise a presumption that they *supposed* the interest of the cargo owner had "ceased," before we offered the coal at Rangoon, and the insurer may have acted upon the same supposition. The defendants are probably as ignorant as we are, who was the absolute "*owner*" of the coal, and whether it was insured or not. Are we to search through the British Isles and the British dependencies, to find out, first, to whom the coal really belonged?—and afterwards,

to begin another round of inquiry and suit, if, haply, we may find the insurer, and sustain a claim against him?

But the defendants have no such difficulty. They have an absolute contract under the hand of a known charterer, binding him to pay them, according to the legal principles of that contract, for delivery of the coal at Rangoon. It has been delivered. If they pay us, their recourse against the charterer is simple and perfect. Their suit would be sustained in the courts of every commercial country in the world. If the charterer was not the owner, he may then recur to his principal, whom he knows. The latter may then recur to his underwriter, if the cargo is insured.

And these successive demands may be sustained, after we are paid, not only for the unsatisfied balance of the original freight, but also for the excess of the new freight. All the authorities, from Emerigon down, so hold.

XIII. The practical solution of this case, on the plaintiffs hypothesis, shows that their doctrine does not tend to any hardship or injustice toward any party, and involves no rights or interests in any legal embarrassment.

The case relates solely to the 850 tons, on which there was due at Rangoon, at the original rate, £1700, and, by force of the new contract, £212.10s. additional, and no more.

Can there be any room for doubt that Hartridge, in deciding to send forward, at the small increase of twelve and a half per cent. on the original freight, such a cargo as coal, for the indispensable use of a steam navigation company, in that remote part of the world, decided reasonably and beneficially? The *apparent* undervaluing of his endeavors by those acting at Rangoon would have been easily enough explained, if it had been pertinent to the present question to put some other facts into the case.

The conduct of the consignees, if honest, is hardly to be accounted for, except upon their apprehension that, if they accepted the cargo, the charterer would be liable for both freights, or at least, for a heavy sum, as *pro rata* freight to

the Mauritius, besides the freight of the Lemont. Under such apprehensions, they may have thought themselves justified in throwing off the burden, to be borne by whom it might concern.

But such apprehension was a gross mistake. In no event could the owner of the cargo be charged with more than the original freight, and the *expense* of 5*s*. a ton for bringing it forward.

He has paid nothing. We received from the sale something more than one-half our due. It is not for the defendants to say that they do not choose to call on the charterer for the deficiency, for it is incontestably due them by our act and service. It is not for the charterer to say that it is a burden for him to pay it, for he has received, or might have received the equivalent commodity, by paying what he agreed to pay, and the small additional expense reasonably incurred for his benefit, and legally due from him.

If his agents have thrown away his opportunity to save his goods, it is a blunder or a wrong which he must bear.

If the defendants' freight was not insured, they are as if ship and cargo had sunk at sea. It is their own loss. If their freight was insured and the loss has been paid, their insurer can recover from the charterer, in their names, by the simplest right of subrogation.

XIV. A test of the plaintiffs' whole case is presented by the question, — Suppose that, upon a proper occasion for transhipment, the master should mistake in his judgment, and omit to tranship, when he might, — who answers for the error?

The solution is given explicitly by our latest and most scientific expositor of the maritime law.

"It is the duty of the master to tranship the goods, or send them on, even by land carriage, if he can with reasonable endeavors; if he fail to do this and a total loss ensues, this is a loss by the misconduct of the master, and if the insurers have insured against that they are answerable. But *the shippers have a right to look to the owners* for compensa-

tion for damage sustained by the wrongdoing of the master; and this right or claim passes to the insurer by abandonment." 2 Parsons' Mar. Law, 372.

Upon two points made by defendants, the plaintiffs reply.

1. As to the citation from 1 Phil. Ins., § 1462, and statements there made, that it is not the duty of the master to tranship "at the charge of his owner," &c., — they are propositions of insurance law, and, as such, are plainly correct, like the similar propositions under § 1634. That the master cannot so bind his owner, as that the latter must bear these expenses, *finally*, at his own charge, we admit; and the right of the ship owner to recover over against the freighter for these charges, and thereby to lay the foundation of claim against the insurer of the cargo, is a part of our case. We only claim that the ship owner is bound to us, in the first instance. The law, both of shipping and of insurance, provides for what shall fall thereon, between him and the other parties, in accordance with the doctrine of Philips, and all other authorities.

2. The contract with De Mattos was made in England, and the contract with Anderson was made, and was to be performed, within British dependencies. The question is not — certainly ought not to be — one of local law, and if it were, there is no such difference between the English and American law as to make these circumstances of any consequence. But the contract between the master of the two American ships was an American contract, if local at all. *Pope* v. *Nickerson*, 3 Story, 465.

*Joseph Dane* and *T. M. Hayes*, for the defendants.

The opinion of the Court was drawn by

KENT, J. — The plaintiffs claim to recover of the defendants, in an action of assumpsit, on an account annexed and with the usual money counts, for the carriage of coal from the Mauritius to Rangoon.

The case comes before us on an agreed statement of facts. The plaintiffs are the owners of the barque Alfred Le-

mont; the defendants were the owners of the ship Waban; both American vessels. The "Waban" having on board a cargo of coal, which had been laden in pursuance of the terms of a charter party, entered into at London, sailed on her voyage from Cardiff to Rangoon, where the coal was to be delivered to consignees named, at a freight of £2 per ton.

On the voyage, the ship met with disasters by the perils of the seas, and was so much injured before putting into Port Louis, or Mauritius, as to be wholly disabled from resuming and completing the voyage to Rangoon, and, upon survey, she was condemned. A part of the cargo had been jettisoned at sea, a part sold by the master at Port Louis for payment of his expenses, and the remainder, about 850 tons, had been put on·shore. In this state of affairs, the plaintiffs' barque, the Lemont, arrived at the same port, and the master of the Waban stated to the master of the Lemont what the condition of his vessel was, and that he had discharged his cargo, and that perhaps he should want the Lemont to carry the coal to Rangoon; to which the master of the Lemont replied, expressing his readiness to take it, if terms could be agreed upon. Two days afterwards, after public notice calling for proposals, the master of the Lemont put in proposals, and his offer, being the lowest, was accepted. The rate of freight agreed upon was £2, 5 shillings; being five shillings per ton more than the rate on the original shipment for the whole voyage. The coal was taken on board and a bill of lading was signed by the master, which states that there had been "shipped, in good order and well conditioned, by S. A. Hartridge, master of ship Waban, in and upon the Alfred Lemont, 850 tons of coal; to be delivered, (perils of seas excepted,) to the same consignees named in the original charter party and bill of lading given by the Waban, at the same port of Rangoon. "Freight for said goods to be paid in cash on right delivery of the cargo, two pounds five shillings." The Lemont arrived safely at Rangoon. The consignees refused to receive

the coal. Thereupon the master of the Lemont, after proper proceedings, caused the coal to be sold at auction. The proceeds of the sale were not sufficient to pay the stipulated freight of two pounds five shillings.

This action is brought by the owners of the Lemont against the owners of the first ship, the Waban, to recover the balance of the freight, for conveying the coal from Port Louis to Rangoon.

The plaintiffs claim to maintain this action, on the ground that the defendants were the shippers of the goods on board the Lemont. There is nothing in the language of the bill of lading, signed by the master of the Lemont, which declares in terms by whom the freight was to be paid. It does not contain the condition, usually found in such bills of lading, after the designation of the consignees, "he or they paying freight for the same." But it has been determined that the shipper named in the bill of lading is liable primarily for the freight, although he does not own the goods, and although there is no express stipulation on the part of the shipper to pay freight. His liability results from having engaged the ship owner to take on board and carry the goods at his instance. *Blanchard* v. *Page*, 8 Gray, 290 ; *Worster* v. *Tarr*, 8 Allen, 270. If, therefore, the defendants were the actual shippers, by themselves or their legally authorized agent, they may be held to pay the stipulated freight.

Were they such shippers?

The goods, as declared in the bill of lading, were "shipped by Hartridge, master of the Waban." The contract was clearly made by him. The case finds that Hartridge "acquainted the master of the Lemont with the condition of his vessel," and informed him that he had landed his cargo. The master of the Lemont then knew that he was acting with the master of a vessel, which had in effect perished by the perils of the sea, and could not be repaired. There is no evidence, beyond these facts, that the master contracted for the carriage of these goods in the name or on behalf of

the owners of the ship. Nothing appears to have been said or understood, between the two masters, as to the capacity in which he acted, whether as agent for the owners of the cargo or of the ship. He put the coal on board at a freight stipulated. The plaintiffs contend that the law fixes the liability of the defendants, from the fact that the master of the disabled vessel thus placed the goods on board, and that he must be held as rightfully representing them in the transaction as their agent.

What, then, are the rights, duties and obligations of the owners of a vessel, which has, by the perils of the sea, become totally disabled from resuming and completing the original voyage, as to the transhipment and forwarding of the cargo to the port of destination?

It is not contended that the Waban could have been repaired within a reasonable time, or at a reasonable expense. She was a vessel lost by the perils of the sea.

The first question is, whether the law requires that the owners of the vessel, *by virtue of the charter party or bill of lading*, should, under all circumstances, forward the cargo in such case, as part of their original undertaking. This, clearly, is not according to the terms of the charter party, nor does it result from the nature of such maritime contract. The agreement is to take on board the vessel named, the goods, and to carry and deliver the same at the port of discharge, — "the perils, dangers and accidents of the seas, rivers and navigation, during the voyage, always mutually excepted." The perils of the seas, did, in this case, prevent the prosecution of the voyage.

*Emerigon,* c. 12, § 16, says, — "the perils of the sea is present, whenever the vessel has been placed out of a state fit for navigation, whether by tempest or stranding." "The right to abandon, as for a total loss, exists when the ship, for all useful purposes of the voyage, is gone from the control of the owner." 3 Kent's Com., 321; *Peele* v. *Ins. Co.,* 3 Mason, 27.

The ship owner is absolved from his contract to carry, if

prevented by the perils of the seas. *Benson* v. *Duncan*, 3
Ex. Rep., (Welsby &. Hartstone,) 655; 3 Kent's Com.,
216. It follows that, if sued for non-delivering under the
contract of affreightment, he may reply that he was pre-
vented from so doing by the perils of the sea, which were
expressly provided for, and in terms made a sufficient ex-
cuse for non-performance. We then have the case where
there is no legal obligation, *under the contract*, on the part
of the ship owners, to tranship and carry forward the goods,
to fulfil their obligation.

But is the cargo to be abandoned and left to perish, with-
out any care or attempt to forward it to the port originally
designated by the parties? Does no duty devolve upon the
ship owner or the master?

If both the ship owner and the owner of the cargo, or
the authorized agents of each, should happen to be at the
port of disaster, in a case like this, could the owner of the
cargo require, as matter of right and duty, that the ship
owner should obtain and employ another ship at a higher
rate of freight than that agreed upon for the entire voyage?
All the writers and authorities agree that no such claim
could be sustained, because the original contract being ended,
and both parties being present to look after their rights and
property, there was no unlooked for emergency, which
forced upon any person or party, from necessity, a care or
agency in respect to the goods. Emerigon so states the
rule, c. 12, § 16.

The case at bar, however, is one where neither party is
present, and the master of the ship is the only person who
is in a position to look after the interests of all parties con-
cerned. What are his duties and powers, and whom can
he or does he bind by his acts or contracts? His ship is
lost, but the cargo remains, discharged from the ship and in
a state fit for re-shipment. This condition of things, of
course, has not been uncommon, since the days of the earli-
est navigators, and has called the attention of the earliest
writers on the law of the seas.

Emerigon says, that, in such a case, "it is not doubtful that the captain, who is *not less the agent of the shippers* than of the owners, must watch over the preservation of the merchandize, and do all that circumstances require for the best."

The Roman law decided that the captain was released from his engagements, if by accident and without his fault the vessel becomes unnavigable during the voyage. Faber and Vinnius, on this law, say that, in such case, the captain is not bound to seek another vessel. The "*Jugemens d' Oleron,*" speaking of the vessel placed out of a state fit to continue the voyage, determines that the master *may* hire another vessel to finish the voyage, and shall have his freight on the wares saved. The ordonnance of Wesby also says that the master may hire another vessel. The French have an "ordonnance" on this subject, which seems to make it the duty of the master to obtain another ship, although both Valin and Pothier differ from Emerigon in his construction of it. They insist that the master is only bound to hire another ship, if he wishes to earn the whole of his freight.

The English authorities seem to leave the question as yet undecided, whether it is the *right* or the *duty* of the master to reship.

The American law is now understood to be that stated by Chancellor KENT, in his Commentaries. "In this country, we have followed the doctrine of Emerigon, and the spirit of the English cases, and hold it to be the duty of the master, *from his character of agent of the owners of the cargo,* which is cast upon him from the necessity of the case, to act in the port of necessity *for the best interest* of all concerned, and he has powers and discretion adequate to the trust, and requisite for the safe delivery of the cargo at the port of destination. If there be another vessel in the same, or in a contiguous port, which can be had, the duty is clear and imperative upon the master to hire it, but still he is to exercise

a sound discretion adapted to the case." 3 Kent's Com., 212.

Now, in the case before us, the master *did* deem it proper to send on a portion of the cargo of the Waban. He found a vessel, the master of which agreed to carry it to Rangoon for 45 shillings per ton, as stated before. He decided that the interest, which he represented, required or justified such transhipment. We see nothing in the case which leads us to doubt that the master acted in good faith, and that, under all the circumstances, it was a reasonable exercise of his powers. But the question behind all this is, did he, by the act, bind the owners of the ship to pay the whole freight, and can this action be sustained against them on an implied promise, arising from the acts of the master? Or, as before stated, were they the shippers of the coal on board the Lemont?

It is important to distinguish between general and limited agency. The master of a vessel is not an unlimited agent for the owners of the ship. He has, undoubtedly, extensive powers, but he cannot act for or bind his owners beyond the authority given to him by them or by the law. It is unnecessary to state more definitely the matters in which he is undoubtedly their agent, and in which his acts bind them. It is enough to say, that, like all other agents, he cannot act or bind his principals beyond the scope of his authority. It does not follow that every contract he may make, even about the ship, is from that fact alone binding. In every case, then, where it is attempted to charge the owners on a contract made by the master, they have a right to require the proof of such facts as show that he had acted within the limits of his authority. Nor does it follow that the owners will be held because the master acted in good faith, nor because the party dealing with him believed, and acted on the belief, that the master had power to bind his owners. The whole matter, as in other cases of agency, must be brought to the test of the law, and the owners will only be held, when the case is brought within the limits of the mas-

ter's power to bind them. *Pope* v. *Nickerson*, 3 Story, 465.
There is nothing mystical or unusual in this matter of a
master's agency. His general authority to bind the owners
of the ship by his contracts is derived from his general and
ordinary character of master, and in that character he can
only bind the owners by contracts relative to the usual em-
ployment of the ship, and the means requisite for that em-
ployment. The master as to the *cargo* is limited to the du-
ties and authority of safe custody and conveyance only, and
except in cases of unforeseen necessity, he is a stranger to
the cargo beyond these purposes. *Millward* v. *Hallet*, 2
Carnes, 82 ; Story on Agency, § 118.

The owner can only be affected by contracts relative to
the master's trust, who is set over the ship and not the car-
go, and the owner of the ship cannot be bound by any con-
tract of the master concerning the purchase of goods or
charges attending them. Ib.

"It would be of most dangerous consequences," (says
Chancellor KENT, in the case above cited,) "to ship owners,
to be held responsible for all the master's contracts and loans
relative to the goods on board ; and it would be unjust in
principle, because such contracts are not within the purview
of the master's trust."

But still, as we have seen, the master may, and is bound
in certain contingencies, to assume authority over the cargo,
and to act efficiently in causing it to be forwarded. How
does he acquire that authority, and from what source is it
derived?

May not a solution of the question, and the reconcilement
of some apparent contradictions in the authorities and in
the doctrines of the writers on maritime law, be found in
the true character of the master and his relations to all par-
ties interested in ship and cargo. When a master stands
upon the deck of his ship, as he sails out of his port of de-
parture, he is primarily, and as he then stands, the rep-
resentative and agent of the owners of the ship. If his
voyage is prosperous and free from disaster, he has no right,

as we have seen, to intermeddle with the cargo on the voyage, or on its safe termination. But he has, so to speak, within himself a latent potentiality, existing in possibility and not in act, of other and distinct powers and agencies, which subsequent events may call into exercise. From a simple captain of the ship, and of that alone, he may, in case of disaster, peril or stress of weather, become an absolute master over the cargo. He may cast it overboard, if the safety of the vessel requires the sacrifice; he may, in case of absolute necessity, sell a part of the cargo; he may, when not forbidden by a positive statute of his country, ransom both ship and cargo. He may be, as he often is, placed in such circumstances that he is from necessity, chiefly by reason of the absence of all other parties, the agent of each and all persons interested in the vessel, the cargo, the freight and the insurance.

Now does the law contemplate, when these latent potentialities are brought into action, and the master is forced to assume, not *new* powers suddenly cast or thrown upon him, but the powers which inhered in him from the first, undeveloped, and in abeyance, that the ship owner is necessarily bound by all his contracts, acts or assumptions of a pecuniary nature, however onerous to him, and although he can never derive any benefit therefrom, and which yet may be of vital importance to the other party for whose use the contract was made?

The master may be, by *appointment* of the owners of the cargo before sailing, the agent or supercargo or factor for such owners. His duties and liabilities under his two characters are as distinct and independent as they would be if the trusts were confided to different persons. *The Waldo,* Daveis, 261, (WARE D. Judge;) *Williams* v. *Nichols,* 13 Wend., 358.

In *Shipton* v. *Thornton,* 9 Ad. & Ellis, 314, Lord DENMAN, speaking of a case of a transhipment at a higher rate than the original freight, says, "another principle will be introduced, — that of agency for the merchant."

Chancellor KENT says, "the character of agent and super-cargo of the owner of the cargo is forced upon the master, and he must, in case of emergency, exercise the discretion of an authorized agent. *Searle* v. *Scovill*, 4 J. C. R., 224.

In the leading case of "*The Gratitudene*," 3 C. Robinson's Adm., 240, Lord STOWELL says, "the authority of agent is necessarily devolved upon him,"—"the character of agent and supercargo is forced upon him," and, in another place, — "the character of agent respecting the cargo is thrown upon the master."

We are inclined to agree with the learned counsel for the plaintiff, that the expressions denoting that the agency or powers of a supercargo are "forced," "cast," "thrown,". devolved, mean only that the exigency requires him to bring into action the latent powers inherent in him in his original character of master for the voyage. But however the agency originates, it is an agency in fact, with the powers, rights and duties of a supercargo. If so, does the cause or mode of appointment affect or vary the actual powers?

When the master becomes the supercargo, does it make any difference whether he was originally designated by the owners, before the voyage commenced, or whether he become such by necessity and force of circumstances? In either case he is an agent for the merchant.

If, in the case at bar, Hartridge, the master, had been appointed supercargo, by the owners of the cargo, before he sailed from Cardiff, and he had made this shipment, under the circumstances as detailed, and without any more definite designation of the party to pay the freight, could the ship owners have been held on an implied promise to pay it? Would not the law hold that he must have acted for the owners of the cargo, for which he was supercargo? Does not the same result follow, if he was such agent or supercargo by force of circumstances? Were his powers to bind those he represented less, because those powers were brought into exercise by reason of the disaster to the vessel? The essential question is, what powers did he actually

possess, and for whom had he a right to act in the ship-
ment on the Lemont?

Instead of a prosperous voyage, the master of the Waban
found himself at Port Louis, his ship totally disabled and,
in legal contemplation, lost. A portion of his cargo he sold
to defray his expenses. This was his first act of authority
in reference to the disposition of the cargo. In that sale,
he necessarily acted as agent for the owners of the cargo
in selling and transferring the title to the goods. The title
remained in the owners notwithstanding the disaster. Only
an authorized agent could transfer the title in their absence.

The remainder of the cargo was on shore. What was
the master's duty in reference to it? There were two ab-
sent parties, both of whom he represented, who were, or
might be, interested in the disposition of the cargo. The
original object of both these parties was the same, viz.,
that the coal should be transported to Rangoon. The ship
owner desired this, that he might secure his freight; the
merchant, that he might have his coal where it was required
for immediate use.

The sum of all the authorities seems to be that the mas-
ter "is bound in duty to do the best for all concerned," or,
in more colloquial language, to do the best he can. *Plan-
tamour* v. *Staples*, Douglass, 219. Assuming that the
American law imposed upon him the right and the duty
both, to cause the cargo to be carried forward, if it could be
done reasonably, the master in this case did do it, in the
manner before stated. For whom did he do it and who is
responsible pecuniarily for his contract? When a master
finds himself in this position of responsibility, and called
upon to act, he is to remember that the owners of his ship
will lose all their freight, if the goods are not forwarded,
and that he, on their behalf, as master, has a right to retain
possession, for the purpose of transhipping in order to earn
the original freight or a part at least. *Mason* v. *Lickbar-
row*, 1 H. B., 359. If this can be done, it answers all the
purposes of the original contract, so far as the principal ob-

ject of the voyage is concerned. If, then, the master can find in the port, or in one within a reasonable distance, another ship, the master of which will agree to carry on the cargo, at a rate at which something may be saved to the owners of the ship out of both freights, it would be his right and his duty to employ the new ship, for the benefit of his owners, and acting on their behalf. For, although there is no legal obligation, under the original contract, yet the owners of the vessel may, if they find it for their interest, forward the cargo in another vessel. It is therefore the right and duty of the master to make all reasonable efforts to obtain another vessel, on such terms as will eventually save something to the owners of the ship. *Hugg* v. *Augusta Ins. Co.*, 7 Howard, 595. In doing this, he acts as master of the vessel, still having in his possession the cargo for the owners of the ship, and has not any occasion, nor is there any necessity for him, to assume the character of supercargo or agent for the merchant. This latent and dormant office still remains in abeyance. 1 Parsons' C. Law, 158 ; *McGaw* v. *Ocean Ins. Co.*, 23 Pick., 405.

But if he cannot find any such vessel, which will take the goods for any sum less than the original freight, is the master at once to abandon the cargo without further effort? Would that be reasonable or right? Although the ship owner may have no duty or interest touching the cargo, its owners may have great interest in having it transported to the port of destination, even at an enhanced price.

In such a condition of affairs, the office of a supercargo comes into action, and it becomes the duty of the master to act for the interest of his principals, and to determine whether it is reasonable to believe that their interests would be subserved by transhipment. He is to do what a judicious and honest supercargo would do in the same circumstances. If he acts in good faith, great latitude may be extended to him, and mere error of opinion and judgment, if there was reasonable ground for his decision, will not render his acts void or make him responsible.

It follows that there may be cases where it is plain that the act of the master, or as supercargo, in employing another vessel, was so unreasonable and so manifestly against the interest of the party he represented, that no one but himself should be bound thereby. The counsel for the plaintiffs, in his able argument, admits that " the duty in question is, not to employ another vessel at all events, but, if it is reasonable, to do so." He however maintains that of this reasonableness the master is the judge, and his judgment is final, so far as a third party is concerned. If this be so, then the qualification that the master must act reasonably is inoperative. If he is required to act reasonably, and yet he is to determine absolutely what is reasonable, it amounts only to saying that whatever the master determines to do is reasonable. It leaves the master with absolute power to bind his owners.

But the counsel further contends that, although it may be true that, as between themselves, the master is agent for all concerned, yet that, in his dealings with others, he is to be regarded only in his capacity of master of the ship and servant of the ship owner. He urges that the ship owner is always known, or may easily be found, whilst the owner of the cargo may not be known; that the new parties, with whom he contracts for relief, are not to be involved in these questions of relative interests. In short, that the new party has a right to regard the ship master as acting, in all these matters, as the authorized agent of the owners of the ship, and that he is not bound to ascertain any of the facts.

There is, it must be confessed, at first view, some plausibility in this position. But it claims too much. Why is not the master of the new ship bound to know or ascertain with whom he is dealing, as in other cases of agency? It will not do to say that the ship owners are bound by *every* contract of the master, made with a third party. We have seen that the master's powers to bind are limited to certain well defined cases. Suppose that a master, at an intermediate port, should engage another vessel to take on a part of

his cargo, his own vessel being uninjured, but he, desiring to make more room for his own personal accommodation, tranships a part of his cargo, although there was no necessity in the case. Would his owners be bound to pay the freight? Clearly not. And why not? Because the master had no right thus to defraud his owners. The master would be bound, doubtless, as he is in all cases of contracts made by himself. There are many like cases, where the owners are not bound by the master's contracts, although made in their name.

This case finds, in the agreed statement of facts, that the master of the Lemont knew that the party seeking the use of his vessel was, or had been, the master of a disabled and lost ship; that his cargo had been landed. He knew, then, that he was acting with an agent. If he desired to know more as to the condition of affairs, and the relation of the master to ship and cargo, and for whom he could legally act, he could have inquired, as he probably did. If not, he doubtless relied upon his lien on the goods as ample security, as it commonly is. If, as in this case, that lien proves insufficient, the party can recover only of the person that was the shipper himself, or by an authorized agent. The question, then, returns as to the agency, in fact and in law.

It is, at first view, somewhat singular that no case can be found where the precise question before us has been determined, on an action by the second ship to recover of any party for the freight, on the ground of personal obligation. The reason of this undoubtedly is that, in most of the cases, the lien on the goods has been sufficient to protect the ship owners, and to compel the consignees, or some party, to pay the stipulated freight, in order to obtain possession of the goods.

The legal principles which lie at the foundation of the action, and upon which it must stand or fall, have been more or less distinctly discussed or alluded to by various authors and in different cases. Several of these have already been referred to in this opinion. Chancellor KENT says, that "we

have followed the doctrine of Emerigon," and he is un-
doubtedly of the highest authority in all questions of mari-
time law. What does Emerigon say as to agency of the mas-
ter? He declares that, " the quality of *captain* makes him
*master*," (that is, as we understand him, master of the situation
in all its aspects and demands.) He adds, " and attributes to
him the care of all that concerns the vessel and cargo. He
is bound to do what it is to be presumed the shippers would
do if they were present." c. 12, § 16. The same author, in
commenting on and condemning a decision under the French
ordonnance, states the argument of the master of the ship
as follows, — (in substance,) — that the voyage had been
determined by the loss of the vessel, still he was bound to
neglect nothing for the preservation of the goods; that he
had been obliged to hire other vessels to bring them to their
destination. Why should the captain, who preserves the
goods and brings them to their place of destination, be ruin-
ed by the additional freight of the substituted vessel? *The
captain is obliged to hire another vessel only in his quality of
factor.* He has therefore to have the choice, either of claim-
ing his freight in entirety, in which case the freight of the
substituted vessel is at his (owners) charge, or of reducing
his freight in proportion to the voyage accomplished, in
which case the freight of the substituted vessel is at the
charge of the goods saved.

Emerigon adds, after this statement, " these reasons were
at once forcible and *legal*."

*Shipton* v. *Thornton*, 9 Ad. & Ellis, 314, is the only
English authority in which we find a distinct reference to a
case where the voyage cannot be completed, except at a
rate of freight from the port of necessity higher than the
original rate. Lord Denman, in that case, says, " it may
well be that the master's right to reship may be limited to
those cases in which the voyage may be completed on its
original terms as to freight, so as to occasion no further
charge to the shipper, and that where the freight cannot be
procured at that rate, another, but familiar principle, will

be introduced, — *that of agency for the merchant.* For it must never be forgotten, that the master acts in a double capacity, as agent of the owner as to the ship and freight, and agent of the merchant as to the goods. These interests may sometimes conflict with each other; and from that circumstance may have arisen the difficulty of defining the master's duty, under all circumstances, in any but very general terms. The case now put supposes an inability to complete the contract on the original terms in another bottom, and therefore the owner's *right* to tranship will be at an end, but still, all the circumstances considered, it may be greatly for the benefit of the freighter that the goods should be forwarded to their destination, even at an increased rate of freight; and, if so, it will be the duty of the master, *as his agent,* to do so. *In such a case,* the freighter will be bound by the act of his agent, and of course be liable for the increased freight."

There are several American cases in which the right and duty of the master to reship in case of disaster are considered. The result of them seems to be what is stated in *Bryant* v. *Com. Ins. Co.*, 6 Pick., 143. "After all, it becomes a question of *reasonable* care and conduct on the part of the master, and, like other questions of that nature, after the facts are found, the law arising from them will be pronounced by the Court." All the cases admit that there is no imperative and inexorable duty in every case to tranship, even for the owner of the cargo, and even if a vessel can be found. The terms may be so onorous as to absorb wholly the value of the goods at the port to which they were destined; the value of the cargo may be nearly or quite as great at the port of disaster as at that port, or there may be other circumstances which would render transhipment manifestly and indubitably injurious to the interest of all parties. Every case must depend upon its own surrounding circumstances. The test question is, what was reasonably required of the master or supercargo under a plain and common sense view of the situation? *Saltus* v.

*Ocean Ins. Co.*, 12 John., 107 ; *Treadwell* v. *Union Ins. Co.*, 6 Cowen, 270.

" What is reasonable and just in the execution of his powers in such cases is legal."

The case of *Thwing* v. *Washington Ins. Co.*, 10 Gray, 443, is a very recent decision by the Court of Massachusetts, and discusses,. with the usual ability and learning of that eminent tribunal, the points involved in the case before us. Although that was not a case against the owners of the first ship to recover freight, yet its consideration involved the principles on which such a claim rests. The Court, in that case, deny the proposition that the master is obliged, in his capacity as agent for the owners of the vessel, in all cases of disaster to the ship, to send forward the cargo, even if it remains in a condition to render its transhipment judicious and expedient ; but hold that no such duty or burden is imposed by virtue of the contract of affreightment. That contract is always subject to the proviso that its performance may be defeated and excused by the perils of the sea. The opinion, however, distinctly recognizes the right and duty of the master to act as agent for the owner of the cargo, after he has ceased to have any such right to act for the ship owner. After alluding to the difficulty of drawing the exact line, which would distinguish the master's authority to act for the various parties interested, the learned Judge, (now C. J. BIGELOW,) states the conclusion as follows : — " But we think that it may be safely said that whenever, and as soon as the owner of a vessel, by reason of the perils of the sea, ceases to have any interest, either in the ship or freight, so that nothing of either can be saved or protected by any act of the master, *his authority to bind the owner is at an end.*

" The subject matter of the master's agency for the owners of the ship, in such a case, ceased to exist, and his power to bind the principal ceases with it. * *· * * In the absence of any adoption or recognition by the owner (of the ship) of such transhipment, we know of no principle or au-

thority on which it can be held absolutely binding on him. On the contrary, the more reasonable doctrine is that stated in 2 Philips on Insurance, § 1634. 'If the motives of the master's course are wholly on the side of one party, then he must be presumed to have acted on behalf of such party.'"

The same general doctrine as to the interests of the party to be affected by a contract by the master is found in *Duncan* v. *Benson*, (Ex. R.,) 1 Welsby & Harlestone, 557.

" In other cases, where, by no possibility the shipper could *derive benefit*, there is no implied authority from him to the master, and the act of sale, or pledge, would be simply wrongful." Why is not the same rule to be applied to the ship owners in their relation to the cargo, situated as this was? In the case of the *Gratitudene*, 3 Rob. Ad. R., 261, the Court declares, "that in all cases, it is the prospect of benefit to the proprietor that is the foundation of the authority of the master."

The case of *Gibbs* v. *Gray*, (Ex. R.,) 2 Harlstone & Norman, 21, is one where, in a case of disaster like the present, the master made the contract of reshipment in direct terms for the owners of the cargo, and as their agent. Although, in that case, the Court denied his power to bind them, yet it was upon the ground that the owners of the cargo had an agent at the port of reshipment, who was not consulted, and, on the further ground, that the contract was *unreasonable*, as it provided for the payment of dead freight. But the power so to bind the owners of the cargo in a proper case was not doubted.

It is urged that the owners of the ship *appoint* the master, and therefore they must be held responsible for his contracts. It is true that they do make the appointment, but they do not thereby themselves create or limit all his powers and duties. The *law* fixes them in almost every respect. The shipper knows, or may know, who he is, and what his character and reputation is or has been. He knows, or is held to know, the law applicable to a master. He knows that he may, in certain contingencies, be called upon to act

in reference to the cargo as his agent or supercargo. He knows, that when those contingencies arise, he may no longer be agent for the ship owners, who appointed him, but for himself. It does not, therefore, necessarily follow that when the owners of the ship employ the master, they confer on him any powers relating to the cargo, as their employee. The law steps in and defines and confers the powers in question on the office he holds.

We are not called upon, in this case, to consider any question arising between the ship owners and the original shippers. Nor are we called upon to consider the question, how far, as between the ship owner and the charterers, the former may be liable for the wrongdoings or *non-feasances* of the master. None such are intimated in the case before us. Our question relates entirely to the validity of a contract, and its binding obligation on the ship owners made with a new and third party.

In this case, we are not called upon to determine, whether, by this shipment of the coal, the master bound the owners of the cargo, by a reasonable exercise of his powers in their behalf. As we have seen, there may be cases where he binds no one but himself. The precise question before us is, whether the ship owners are liable, as on implied promise, to pay the stipulated freight in the second ship on the facts stated. If they are, then the owners of the ship are to be holden liable, as shippers of the cargo, for the freight of goods in which they never had any ownership or title, and from the further carriage of which, under the contract, they have been absolutely absolved, and from the transportation of which in the new ship, as it is admitted, they cannot derive any benefit, or save any part of the original freight, and where they are not named or recognized as such shippers in the bill of lading, or by the master in his negotiations, and where no subsequent ratification is pretended.

We do not think that, under the circumstances of the case as they existed, it would have been "a reasonable exercise of the master's powers, if he had attempted to bind

the owners of his ship by a distinct promise in their behalf to pay the new freight.

And it would be, certainly, as unreasonable in the Court to hold them liable on an implied promise, and as the actual shippers of the coal, in the absence of any evidence of an attempted agency, or direct promise on the part of the master. *Plaintiffs nonsuit.*

APPLETON, C. J., DAVIS, WALTON, DICKERSON and DANFORTH, JJ., concurred.