## McLoon's Administrator *versus* Cummings.

1. General average is a contribution by all the parties in a sea adventure to make good the loss of one of them for voluntary sacrifices of part of the cargo to save the residue and the lives of those on board from an impending peril, or for extraordinary expenses necessarily incurred by one or more for the general benefit of all the interests in the enterprise.

2. General average extends to the loss of the ship when the cargo is saved; and the loss of the cargo when the ship is saved.

3. When after abandonment of the vessel the cargo is sent to the port of destination, as a general principle the parties are bound by an adjustment fairly made by an adjuster at that port, according to the rules, &c., there.

4. This rule does not obtain in case of fraud or gross mistake; or when a voyage is broken up and ended, where a final separation between the vessel and cargo has taken place and the relations of the parties have terminated: then the port of disaster would generally become the place of adjustment.

5. Where the cargo is sent from the port of disaster to the port of destination by another vessel at a higher rate of freight than under the original contract, the contribution is to be on the basis of the value of the cargo at the port of destination.

6. Where the deviation is justified, in case of disaster by a peril of the sea, disabling the vessel from proceeding, the master becomes the agent of all the parties in interest; the subject of the interests are the vessel, the cargo and the freight.

7. If the vessel cannot proceed, it is the duty of the master to reship the cargo if he can, to the port of destination, to protect all interests, doing what he fairly and conscientiously believes is for the interest of all.

8. If the master can save part of the freight to the owner, he will be considered his as well as the shipper's agent; if he can save nothing for the owner he will be agent of the shipper alone.

9. A vessel chartered at Baltimore to carry coal to San Francisco, having met with disasters at sea, bore away to Rio, where after the proper proceedings she was abandoned and the master shipped the cargo to San Francisco by another vessel at higher freight, by the bill of lading " to be delivered * * * unto order or ———, assignees, he or they paying freight," &c. The bill was endorsed to Wright, who endorsed it deliverable to Cummings, San Francisco. The master of second vessel would not deliver the coal except on payment of freight, &c., and Cummings would not so receive it; the coal was sold for less than the freight and expenses. The acts of the master were ratified by the owner of the ship. *Held*, that under the circumstances, the separation of interests was not complete at Rio, but continued until the arrival at San Francisco, and the sale of the cargo there.

10. The freight and charges at San Francisco having consumed the value of the cargo, in a suit by the owner against the shipper, it was *Held*, that there was nothing upon which the general average could be charged; and the recovery was confined to the special charges on the coal.

11. The master paid a premium for gold drafts at Rio to pay the expenses there; *Held*, that verdict should be for the amount found in gold, not for the premium paid.

January 16th 1873.    Before READ, C. J., AGNEW, WILLIAMS and MERCUR, JJ.    SHARSWOOD, J., at Nisi Prius.

[McLoon v. Cummings.]

Certificate from Nisi Prius: Of January Term 1870, No. 76½.

This was an action of assumpsit brought October 2d 1869, by William McLoon against Henry W. Cummings.

The history of the case by the plaintiff in error, the defendant in error having made no counter statement, is as follows:—

On June 17th 1867, the "Juliette Trundy," owned by William McLoon, of Rockland, Maine, was chartered by Henry K. Cummings, in Philadelphia, to carry a cargo of coal from Baltimore to San Francisco at $16 per ton, in currency. On July 18th 1867, the vessel sailed from Baltimore with her cargo of about 1181 tons of coal. Very soon after leaving port she began to experience exceedingly boisterous and tempestuous weather, which continued with scarcely an intermission for more than a month. Her masts were split and partly carried away, her sails were in like manner damaged, her whole hull was very much strained, she began to leak, and the storm still continuing and the leak increasing, the captain held a consultation, and for the safety and benefit of all concerned, on September 4th 1867, he determined to put into Rio de Janeiro. She reached Rio de Janeiro safely on September 14th. Four surveys were duly held under the directions of the American consul. By the direction of the surveyors all of the cargo was landed, and, after a thorough examination, they gave directions as to the repairs necessary to be made in order to put the ship in such condition as would enable her to pursue her voyage. The captain advertised for proposals for these repairs and submitted the offers to the surveyors. It was found that the cost of the repairs at Rio would exceed the value of the vessel, and the surveyors recommended her sale. Acting under this advice and that of the American consul and Wright & Co., the largest American house at Rio, Captain Perry sold the vessel at public auction and all her apparel.

Captain Perry then made full inquiries as to the value of coal at Rio and the prospect of disposing of the same. He found that while its real value there was 21 mille reis per ton, owing to the state of the coal market at that particular time, it could not be sold for more than 5 mille reis per ton. He then sought a ship in which to forward the coal to San Francisco, and found the "Shatemuc" was in port, and he sent forward the cargo at an increased rate over what it was to have paid in the "Juliette Trundy." All of this was done by the captain upon consultation with the American consul, Wright & Co., and others in Rio. He then paid all his expenses at Rio, drew on William McLoon for additional money (about $7000), and sailed for New York. His drafts were honored and paid by McLoon. The premium paid by him was 40⅜. In his whole dealings with the ship and cargo the captain acted without consultation with McLoon, as he could not get an answer from him at Rio in less than three months.

[McLoon *v.* Cummings.]

The "Shatemuc" reached San Francisco on March 14th 1868, when it appeared that the value of her cargo was probably *less* than the freight due the "Shatemuc." The consignee refused to receive the coal and pay the freight, the captain requiring a general-average bond. The captain sold the cargo for payment of his freight, and it yielded less than the freight came to.

The bills paid by Captain Perry at Rio and his accounts were sent by Mr. McLoon to Richard S. Havens, Esq., the leading and well-known adjuster at Boston, who prepared an adjustment of the general average charges and the particular charges. In this he put the valuation of the cargo at the ordinary value of the same at Rio in September 1867.

This adjustment was sent, in April 1868, to Mr. Cummings and his insurers in Philadelphia, who insisted that the adjustment was to be made at San Francisco. The bills and accounts were then sent to San Francisco, where Thomas Cazeneau, Esq., made an adjustment.

Both of these adjusters agreed that it was a case for general average, and their aggregates of these charges and the special charges against the cargo differed but slightly; Havens making the general-average charges, in currency, $8880.62, and the particular charges against the cargo, in currency, $2313.30, and Cazeneau making them respectively, in gold, $6822, and $1604.93.

The action was by McLoon to recover these charges.

The facts in detail, so far as necessary to the understanding of the case, will be found in the opinion of the Supreme Court.

The case was tried December 13th 1871, before Sharswood, J.

He charged that the plaintiff was not entitled to recover the premium paid by him upon the gold expended for defendant in October 1867—but that the verdict of the jury should be rendered payable in gold.

He also reserved the following points :—

1. Whether, when a ship has been disabled by perils of the sea, puts into an intermediate port to repair, and the vessel is then condemned and sold, and the voyage broken up, the expenses so incurred are the subject of general average.

2. If so, whether the rate of contribution is to be adjusted upon the basis of the value of the cargo at such place of repairs, or at the port of destination, if the cargo is sent on by another vessel at a rate of freight exceeding that stipulated to be paid under the original contract of affreightment.

3. When the cargo is so sent to the port of destination, whether the parties are bound by an adjustment fairly made by a *despacheur* (adjuster) at such port according to the rules and usages there established?

He then directed the jury to render a special verdict finding the

amount of the special charges and of the general-average charges at Rio de Janeiro, separately.

The jury found a verdict for the plaintiff for the

| | |
|---|---|
| special charge in gold, . . . . . | $2069.56 |
| General-average charge in gold, . . . . | 5801.96 |
| | |
| Total in gold, . . . . . . | $7871.55 |

Afterwards, Judge Sharswood overruled the motion for new trial, and entered judgment for the plaintiff on the verdict for the special charge for $2069.56, refusing to enter the verdict on the points reserved on the general-average charge.

The plaintiff died after judgment was entered, and Robert H. Hinchley, Jr., his administrator, was substituted as plaintiff.

The plaintiff took out a writ of error, and assigned for error:

1. That the court charged that the plaintiff was not entitled to recover the premium paid him for gold for payment of expenses, &c., in Rio Janeiro.

2. Not entering judgment on the general-average charges.

3. Not entering judgment for the plaintiff for the whole amount of the verdict on the points reserved.

*G. Junkin* and *G. W. Biddle*, for plaintiff in error.—1. The expenses in this case were the subject of general average: Star of Hope, 9 Wallace 228; 2 Arnould on Ins. 77, 881; McAndrews *v.* Thatcher, 3 Wallace Rep. 345; 2 Parsons on Ins. 210, 277; 1 Pars. on Ship. 246; 2 Phil. on Ins. 61.

In order to be complete, there must be—1st, a common danger; 2d, a voluntary sacrifice or expenditure; 3d, it must result in success. As to *expenditures*, this latter point is qualified.

This was a case of *expenditures* for the common good, and *not* one of *sacrifice*. In the case of sacrifice, if subsequently the vessel and cargo are lost before the end of the voyage, there is no contribution, because the presumption is, that if the thing sacrificed had remained on board it would have perished with the rest. But in the case of *expenditures* the rule is different: 2 Arnould on Ins. 924, sec. 340; Phillips on Ins. 133; Ins. Co. *v.* Jones, 2 Binney 547.

Disbursements made for the common safety, must be reimbursed in general average, whether the ship and cargo are ultimately saved or not: Sturgis *v.* Cary, 2 Curtis 382; 2 Pars. M. Ins. 210, 259, 277, 279, 280, 331; Caze *v.* Reilly, 3 W. C. C. R. 298; Berkley *v.* Presgrave, 3 East 228. Where, owing to stress of weather, &c., the vessel puts into a port to refit, from the moment the deviation commences the expenses, wages, &c., are the subject of general average: Star of Hope, 9 Wallace 228; Campbell *v.* The Allkomac, Bee's Rep. 124; 2 Pars. on M. Ins. 257, note; Potter *v.* Ocean Ins. Co., 3 Sum. 27; The Mary, 1 Sprague 17;

[McLoon *v.* Cummings.]

Willard *v.* Dorr, 3 Mass. 161; Arnould on Ins. 350, note. The claim for contribution may be maintained against the owner of the cargo, although the vessel is totally lost or sold, and the voyage broken up: Col. Ins. Co. *v.* Ashly, 13 Pet. 331; Gray *v.* Waln, 2 S. & R. 229; Caze *v.* Reilly, 3 W. C. C. R. 298; 3 Kent 237, note; The Natt. Hopper, 3 Sum. 542; Merithew *v.* Sampson, 4 Allen 193; Bell *v.* Smith, 2 Johnson 98; Job *v.* Langton, 6 Ellis & Bl. 779; Moran *v.* Jones, 7 Id. 532; M. & P. on Shipping 322; Nelson *v.* Belmont, 7 Smith (21 N. Y.) 36; McAndrews *v.* Thatcher, 3 Wallace 347.

The general rule of all contributory maritime interests is, that their contributory value is that which they have at the time and place where they are considered as finally saved: 2 Pars. on M. Ins. 343. Where the voyage is broken up and the separation takes place, then the cargo must contribute according to its value at the port of necessity: Arnould on Insurance 812, 933, 1373, 1374, 1375; 2 Phillips on Ins., sec. 1393; Mu. Ins. Co. *v.* George, 3 N. Y. Leg. Ob. 268; 3 Kent 242; Tudor *v.* Macomber, 14 Pick. 38; Abbott on Shipping 504, note 2; Marshall on Ins. 467; Rogers *v.* Mech. Ins. Co., 2 Story Ct. C. 173; Douglass *v.* Moody, 9 Mass. 547; Spafford *v.* Dodge, 14 Id. 79.

Where the ship is damaged so by sea perils as to be a wreck, or must be sold, her value at the port of necessity, or the price she there brings at a fair sale, is her contributory value: 2 Arnould on·Ins., sec. 346, p. 435; Star of Hope, 7 Wallace 235; 2 Pars. on M. Ins. 329, 343; Bell *v.* Smith, 2 Johnson 98; Lee *v.* Grinnell, 5 Duer 400; Mutual Ins. Co. *v.* George, .Olcott 157.

When the voyage is broken up by the loss or disablement of the ship, and the cargo is saved, the master becomes the agent, not only for the owner of the vessel, but also for the .cargo; and it is his duty to forward the cargo to the port of destination: 2 Parsons on Ins. 274, note 2; Pars. on Ship. 234; 3 Kent 210; Skipton *v.* Thornton, 9 A. & E. 314; Saltus *v.* Ocean Ins. Co., 12 Johnson 107; Hugg *v.* Augusta Ins. Co., 7 Howard 595; Searle *v.* Scovell, 4 Johns. 218; Treadwell *v.* Union Ins. Co., 6 Cowen 270; Bryant *v.* Com. Ins. Co., 6 Pick. 130; Bost *v.* Norton, 2 McLean 422; Jordan *v.* Warren Ins. Co., 1 Story 342; Winter *v.* Del. Ins. Co., 6 Casey 334; 2 Phillips on Ins. 439, 449.

When the voyage is broken up, and the captain sends forward the cargo at an increased freight, he is the agent for the owner of the cargo alone, and not for the owner of the vessel. If he sends forward at a reduced freight, then he acts for the owner of the vessel: Jordan *v.* Warren Ins. Co., 1 Story Rep. 342; Gibbs *v.* Gray, 2 H. & N. 22; Nelson *v.* Belmont, 7 Smith (21 N. Y.) 44; Durnett *v.* Traphagen, 3 Johnson 156; The Saratoga, 2 Gallison 178, note 23, cases cited; Scott *v.* Libby, 2 Johnson 340; Thwing *v.* Wash. Ins. Co., 10 Gray 443; Lamont *v.* Lord, 52

Maine 365; The Gratitudine, 3 Rob. Adm. 240; Emerigon on Ins., c. 12, sect. 16, pl. 6, 343; 2 Phillips on Ins., sect. 16, 24.

Adjustment ought to be made at the port of separation: 2 Parsons on M. Ins. 361; Loring v. Nep. Ins. Co., 20 Pick. 411. A foreign adjustment, to a certain extent, may be binding, but it may be impeached: 2 Pars. 265, 266, 365, 366, 370; Thornton v. U. S. Ins. Co., 3 Fairf. 150; Chamberlain v. Reed, 13 Maine 357.

*M. P. Henry* and *R. C. McMurtrie*, for defendants in error.— The *sacrifice* for which the owners of the cargo are called upon to contribute, is the endurance or submission to an uncontrollable necessity: Barnard v. Adams, 10 Howard 270.

The three essentials of all general-average claims apply equally to sacrifices and expenditures; that is to say, they must be voluntary, necessary, and effectual: 2 Wharton's Digest, p. 48, title "Insurance," Myle v. The Harriet; Williams v. The Suffolk Ins. Co., 3 Sumner 510.

The rule of restitution can only apply to expenditures for the common benefit, extraneous to the adventure, and not to those ordinary expenses of the ship, caused by a deviation in a voyage which the vessel was unable to continue: Stevenson General Average 74. The American adjustments as a rule, but not universally, do allow these expenses as general-average charges: Walden v. LeRoy, 2 Caines 262. These expenses are to be borne by the ship, freight and cargo, in the proportions in which they receive actual benefit. The expenses on the cargo before it reaches the owner's hands are to be deducted, *e. g.* freight and salvage.

The voyage was continued under the same contract, and was a continuation of the voyage by the "Juliette Trundy": Pierce v. Columbian Ins. Co., 14 Allen 320; Winter v. The Del. Ins. Co. 6 Casey 334.

The breaking up of the voyage at the port of distress does not constitute the master the agent for the cargo, to accept it there for the owner, so as to render it liable to pay freight *pro rata itineris:* The Ann D. Richards, 1 Abbott's Admiralty Rep. 499; Ewbank v. Nutting, 7 Com. B. 797.

The right to general average, even if due, is lost by the refusal of the owner of the "Juliette Trundy" to deliver the cargo to the consignee, except on terms he had no right to exact: Scaife v. Sir John Tobin, 3 Barn. & Ad. 523.

The port of destination is the place for adjusting general-average charges; and an adjustment made there, according to the custom of the port, is binding on all parties: Strong v. The Firemen's Insurance Company, 11 Johns. 323; Loring v. The Neptune Insurance Co., 20 Pick. 411; Gray v. Waln, 2 S. & R. 229; Simmons v. White, 2 B. & C. 805; Dalglish v. Davidson, 5 Dow. & Ryl. 6; Richardson v. House, 3 B. & Ald. 237. The general

[McLoon v. Cummings.]

average is to be made on the *clear* value at the port of destination: 2 Parsons on Marine Ins. 344; Hugg *v.* The Augusta Ins. & Banking Co., 7 Howard 995.

The opinion of the court was delivered, March 17th 1873, by AGNEW, J.—On the trial of this case at Nisi Prius three points were reserved. The first was: "Whether, when a ship has been disabled by the perils of the sea, puts into an intermediate port to repair, and the vessel is then condemned and sold, and the voyage broken up, the expenses so incurred are the subject of general average?"

Henry K. Cummings chartered the ship "Juliette Trundy" of the owner, William McLoon, for a cargo of coal from Baltimore, Maryland, to San Francisco, California. Storm and stress of weather injured the vessel, caused her to leak badly, and drove her for safety into the port of Rio de Janeiro, where, after the proper protests and necessary surveys, she was condemned as unseaworthy and sold, and the cargo was forwarded by her captain to San Francisco in the "Shatemuc," under a charter-party. It is evident that the vessel was disabled by the perils of the sea and her voyage broken up; and the deviation into a port of distress was voluntary, in order to save the vessel and cargo as far as possible, and the lives of those on board. The expenses which followed were necessarily incurred to ascertain the ability of the vessel to proceed on her voyage and to save the cargo from loss, and the cargo as thus saved was forwarded to the port of destination. The expenses incurred at Rio de Janeiro were *extraordinary*, and were necessarily incurred by the captain as the common agent for all interested, and therefore including the shipper.

General average has been defined to be a "a contribution by all the parties in a sea adventure, to make good the loss sustained by one of their number on account of *sacrifices* voluntarily made of part of the ship or cargo, to save the residue and the lives of those on board from an impending peril, or for *extraordinary* expenses necessarily incurred by one or more of the parties for the general benefit of all the interests embarked in the enterprise:" Star of Hope, 9 Wallace 228; McAndrews *v.* Thacker, 3 Id. 365; Nelson *v.* Belmont, 21 New York 38. The right to general average extends to the loss of the ship when the cargo is saved in whole or in part, as well as to the loss of the cargo, when the ship is saved: Gray *v.* Waln, 2 S. & R. 229; Lage *v.* Richards, Id. 137; Bernard *v.* Adams, 10 Howard 270; 3 Wallace 365–6; 9 Id. 204. We see no reason to doubt, therefore, that the cargo in this case would be subject to general average if it had any value left when it arrived at San Francisco, and the cargo was sold for the charges.

The third point reserved was: "When the cargo is so sent to

[McLoon v. Cummings.]

the port of destination, whether the parties are bound by an adjustment fairly made by a *despacheur* at such port, according to the rules and usages there established?" We are inclined to affirm this as a general principle of maritime law. There are many reasons for this rule, some of which arise in the fact that this port is that of the intended market upon which the calculation of the shipper is founded, and is also the end of the ship's voyage as contemplated by the owners. Besides, the want of uniformity in the customs and rules of ports of different countries renders it essential that a certain port should be adopted as the place of adjustment, and the only practicable rule which can be followed in the midst of variety is to take that port for which the cargo is destined, and where the voyage is terminated. The circumstances and customs of this port, it is to be presumed, were in the minds of the parties in entering into the charter-party, while the market for the cargo there is to be presumed to be the best. Yet, conceding this to be a general rule, we must except the cases of fraud or gross mistake, and of a voyage broken up and ended, where, from the facts in the case, or the mutual acts of the parties or their agents, a final separation between the vessel and cargo has taken place, and the relations of the parties have actually terminated. In the last case the port of disaster would, generally speaking, become the place of adjustment. Such we think is the result of the authorities referred to.

This leads us to consider the second reserved point, which becomes the hinge of the case, viz. : " Whether the rate of contribution is to be adjusted upon the basis of the value of the cargo at the place of repairs, or at the port of destination, if the cargo is to be sent on by another vessel at a rate of freight exceeding that stipulated to be paid under the original contract of affreightment."

It is contended on behalf of the plaintiff that the voyage was broken up at Rio de Janeiro, the vessel and cargo actually separated, and that the relations of the parties finally terminated there. Is this so ? McLoon, the owner of the vessel and plaintiff, seems not to have thought so in the first instance. He had the first adjustment made at Boston, February 1st 1868, and the second at San Francisco, September 17th 1868. None seems to have been made, or thought of, according to the rules of the port of Rio de Janeiro. We must, therefore, examine the facts to determine whether, in the contemplation of the parties, their relations finally terminated at Rio de Janeiro, and the separation of the cargo became so complete, that the port of destination ceased to be a common point for the adjustment under the charter-party, and that of distress became the end of their adventure.

First it may be noticed that the charter-party contains no covenant or proviso, enabling the owner of the vessel to terminate his voyage at Rio de Janeiro or any intermediate port; it does not contain even the common exception of the perils of the sea. He

[McLoon *v.* Cummings.] ·

must stand, therefore, only upon the law as it would arise upon the facts of his deviation into the port of Rio de Janeiro. But conceding the deviation to be justified, it is a well-settled principle of maritime law that in the case of a disaster by a peril of the sea, rendering the vessel unable to proceed upon her voyage, the master or captain becomes the common agent of all the parties in interest; the subjects of these interests are the vessel, the cargo and the freight. It is, therefore, the duty of the master, if the vessel cannot proceed, to reship the cargo, if he can, to the port of destination, so as to protect all interests. For this purpose he must exercise a large discretion, according to the circumstances. For in the absence of owner and shipper, and alone, as he is usually in a distant port, he must do what he fairly and conscientiously believes is for the interest of all. These are general principles borne out by the authorities: 3 Kent Com. 219, 212; 2 Parsons on Ship. 234; Lamont *v.* Lord, 52 Maine 388, *et seq*.; Thwing *v.* Wash. Ins. Co., 10 Gray 457 to 460; Winter *v.* Del. Ins. Co., 6 Casey 335. In forwarding the cargo to the port of destination the master may act for both owner and shipper. If he can save part of the freight to the owner he will be considered as his agent as well as the agent of the shipper. But if he can save nothing for the owner of the vessel, he will not be the agent of the owner but of the shipper alone. The foundation of this exception is, that an authority arising from implication only will not be presumed where the act of the master is clearly injurious to the interests of the owner of the vessel. These being governing principles, a separation of the relations between the owner and the shipper would be deemed to have taken place in this instance, if the only facts to be considered were the condemnation and sale of the vessel at Rio de Janeiro and the forwarding of the cargo by the captain at a greater rate of freight from Rio de Janeiro to San Francisco than the freight agreed upon in the charter-party from Baltimore to San Francisco. The stress of the argument for the plaintiff rests upon this view of the case. · But these are not the only facts, while upon the whole evidence its weight carries the adjustment to the port of San Francisco. In addition to the fact already noticed, that the charter-party is without a saving covenant, leaving the question of deviation into Rio de Janeiro open to a controversy, which the owner of the vessel, or the captain as his agent, might prefer to avoid, the following elements are to be found in the evidence: Captain Perry, the master of the Juliette Trundy, entered into a charter-party with Captain Soule, master of the "Shatemuc," without disclosing a principal; the vessel was to be consigned to the *charterer's* agent at the port of discharge, and freight to be paid on unloading and right delivery of the cargo in cash. The bill of lading by the Shatemuc was signed by Wright & Co., as agent for Captain Perry, cargo to be delivered at San

[McLoon *v.* Cummings.]

Francisco "unto order or to ⸺, assignees," he or they paying freight as per charter-party.   Wright & Co., for Captain Perry, endorsed this bill to the order of John S. Wright, Esq., agent at New York, and it was transmitted to New York, when John S. Wright, agent, endorsed it deliverable to William B. Cummings & Co.   Captain Perry testifies that the bills of lading, charter-party per Shatemuc, and all the papers were forwarded to the *plaintiff*, McLoon; and in answer to a question why the bill of lading was not forwarded to San Francisco to await the arrival of the Shatemuc there, said he was told by Mr. Wright that the adjustment would be made in Boston, and the average would be forwarded to San Francisco.   He also testifies, that in all he did he acted upon his own judgment for what he thought to be the best interests of *all* concerned.   Now in all this it is clear he so acted to preserve to McLoon the power to control the cargo at the port of destination, so far as to protect any interest he deemed himself to possess there.   In this his acts were met by McLoon and ratified.   On the arrival of the Shatemuc at San Francisco, Wm. B. Cummings & Co., to whom Wright of New York finally endorsed the bill of lading, had no authority to receive the cargo.   On the 14th of March, Captain Soule, after the arrival of the Shatemuc, notified Wm. B. Cummings & Co. of his readiness to deliver the coal on payment of the freight, delivery of the bill of lading, and *bond for payment of the general average incurred* for charges at Rio de Janeiro.   Captain Soule, on the 19th of March, telegraphed to McLoon: "Where are the Shatemuc's bills of lading to Trundy's cargo?"   McLoon replied by telegraph, March 21st: "Deliver your cargo to Wm. B. Cummings & Co. upon their giving *bond to pay general average.   Bill of lading on the way.*"   Wm. B. Cummings having telegraphed to Henry K. Cummings the arrival of the Shatemuc without papers or bill of lading, the latter, on the 19th of March, wrote to McLoon.   McLoon replied March 24th, saying he had received a despatch from Captain Soule, and telegraphed him to deliver cargo to Wm. B. Cummings *upon his giving general average bond;* also that he supposed H. K. Cummings would have paid the general average on cargo here (Boston), but if not should have to *send the paper to San Francisco.*   The facts show plainly that none of the parties recognised the port of Rio de Janeiro as the place of final separation of interests; that Captain Perry considered himself as still acting for McLoon, to enable him to control the cargo, and that McLoon ratified his acts by assuming to control the delivery of the cargo on his own terms, and himself adopted San Francisco as the place of adjustment, failing to secure it at Boston.   Under these circumstances the separation of interests was not complete at Rio de Janeiro, but they continued together until the arrival of the cargo at San Francisco, and its sale there to pay the freight and charges from Rio de Janeiro to San Francisco.

[McLoon *v.* Cummings.]

The reasons of McLoon for retaining control are not very apparent, but they may have arisen from a belief that San Francisco would be the best market for the cargo. It is certain, however, that he so acted as to control the cargo after it left Rio de Janeiro, and on its arrival at the port of destination. Having done so, the value of the coal at that port is the true criterion in the adjustment, and the evidence as clearly shows that its entire value was consumed by the freight and charges.

The proof is satisfactory that the adjustment at San Francisco was made "in accordance with the usage and customs of that port," and that the principle adopted there is, "that what is *saved* shall pay, and nothing remains where charges consume the whole value." "The custom at San Francisco is to deduct at San Francisco, from the value of the cargo at that place, the freight, special charges and commission of five per cent." In this state of the case, the entire cargo being lost to the shipper, there was nothing upon which general average could be charged. The judge at Nisi Prius was therefore right in confining the recovery to the special charges on the coal.

The remaining question is, whether the plaintiff was entitled to a verdict for the difference between gold and the national currency in legal tender notes. The judge directed the verdict to be rendered for the sum recovered in gold. We think this was right, in view of the nature of the transaction, and the contract to be implied from it. It is argued that there was no express contract, and therefore the judgment should have been for currency, adding the premium paid for gold as the actual expenditure of the plaintiff. But the expenses were incurred in a foreign country upon a gold standard, and the draft drawn by the master of the Juliette Trundy at Rio de Janeiro, on the plaintiff as her owner, was for gold. Gold, therefore, was the basis of the transaction and of the adjustment. The liability of the parties should be measured by that standard; gold coin also being one of the legal standards of money in the United States, and therefore directly applicable as a measure. The expenditure being founded on a gold basis, and being a foreign transaction, the contract to be implied from it must follow the same nature, especially in view of there being a legal national currency whereby it can be measured. The settlement of such a foreign transaction, on a uniform and proper basis, must result in due proportion of contribution among all interests. It is only in the payment in this country, in a currency of less value, the alleged loss arises, and that arises between the two species of legal currency, the result of local causes and not attributable in any way to the adjustment upon the foreign gold basis. The right of the party paying the draft seems to be that of receiving the proportion which others pay, and which he has advanced upon the basis of the transaction, which was gold and not legal tenders. The fluctua-

[McLoon *v.* Cummings.]

tions between the two species of lawful money, in the interval between adjustment and payment, ought not to be permitted to prejudice the judgment which is founded on the gold basis, itself a uniform and unchanging standard. If gold was now at twice the premium paid by the plaintiff, he would be entitled to his judgment payable in gold, and the loss would then fall on the defendant. Gold being the measure of the debt, it seems to us should be the measure of the payment also. Where all interests are measured by a common legal standard, no injustice is done to any one. The payment, therefore, should follow the nature of the liability.

Judgment affirmed.